## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| INTERMARINE, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| KASPER BIHLET, | ) | |
| Defendant | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Intermarine, LLC ("Intermarine") files this Complaint for equitable relief and damages against defendant Kasper Bihlet ("Bihlet") and states as follows:

## I. INTRODUCTION

1.　Intermarine seeks damages and injunctive relief against Bihlet, a former officer and employee of Intermarine. While employed by Intermarine, Bihlet entered into an employment agreement which contains non-competition, non-solicitation and non-disclosure provisions. Bihlet has violated and continues to violate the provisions of this agreement by working for or on behalf of Spliethoff Americas, Inc. ("Spliethoff"), a competitor of Intermarine, by soliciting or assisting Spliethoff in soliciting one or more of Intermarine's clients, and by disclosing Intermarine's confidential information to Spliethoff.

2.　Bihlet's employment with Intermarine ended June 26, 2013. His non-compete agreement prohibits him from working for or on behalf of a competitor before December 26, 2013. On information and belief, in addition to his illegal conduct while working for or on behalf of Spliethoff, Bihlet also took steps on behalf

of Spliethoff while he was still employed as Intermarine's Vice President for Worldwide Chartering, in violation of the fiduciary duty he owed to Intermarine as one of its officers. Bihlet's actions have damaged and continue to damage Intermarine, by interfering with its existing and prospective client relationships and with its protection and use of its confidential and proprietary business information and trade secrets, and by other actions, as set out below.

## II. PARTIES

3.     Plaintiff Intermarine is a Louisiana limited liability company. Its sole member is Industrial Maritime Carriers (Bermuda), Ltd., a Bermuda corporation with its principal place of business in Bermuda.

4.     Defendant Kasper Bihlet is an individual citizen of Denmark, a foreign state under 28 U.S.C. § 1332(a)(2). He is an alien admitted to the United States for permanent residence, and is deemed under 28 U.S.C. § 1332 to be a resident of the State of Texas, where he has his domicile in Harris County.

## III. JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as there is complete diversity and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     Venue is proper under 28 U.S.C. § 1391(b)(1) because defendant resides in this district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is also proper under the forum selection clause in the employment agreement between Bihlet and Intermarine.

## IV. FACTS

7.      Intermarine is a global leader in the highly competitive market for worldwide transport of specialty cargoes, including breakbulk, heavy lift, dry bulk, and project cargoes.  Examples include oversized, out of gauge goods not stored in containers (breakbulk cargoes), power generation or other equipment with weights in excess of 75 metric tons (heavy lift cargoes), grains and other bulk commodities (dry bulk cargoes), and goods intended for infrastructure, power and construction projects, and rigs and other equipment for the oil and gas industry (project cargoes).

8.      Intermarine was founded in New Orleans in 1990.  Through its subsidiaries and worldwide network of 18 offices, the company controls an international fleet of more than 45 vessels with lifting capacity up to 800 metric tons. Intermarine  provides ocean transportation and marine logistics services with regular sailings in the Americas (including the United States, Mexico, Central America, the Caribbean, and the North, East, and West Coasts of South America), as well as service to and from West Africa, Europe, Asia, and the Middle East, plus inducement (special order) voyages to Australia and other international ports.  The company operates the largest U.S. flag heavylift fleet.  It also controls Industrial Terminals, the largest project cargo terminal in the United States, located adjacent to   the   Houston   Ship   Channel.   *See*   Ex.   1,   Intermarine's   website, www.intermarineusa.com  visited August 12, 2013.

9.      There  are  approximately  twenty  players  in  this  specialized  global shipping  market.    One  of  the  market's  leaders,  and  a  direct  competitor  of Intermarine  with  respect  to  several  of  Intermarine's  services  areas,  is  the

Amsterdam-based Spliethoff Group.   According to its website, Spliethoff is "the largest shipowner in the Netherlands. The group consists of Spliethoff and her subsidiaries <u>BigLift Shipping</u> (heavy lift), <u>Sevenstar Yacht Transport</u> (yacht transport), <u>Wijnne Barends</u> (short sea) and <u>Transfennica</u> (liner service) . . . .  The Spliethoff Group plays a leading role worldwide in the transport market for forest products, projects, super heavy-lift, general cargo and yachts."   *See* Ex. 2, Spliethoff Group's website, www.spliethoff.com/, visited August 9, 2013.  The Spliethoff Group owns and operates a fleet of over 100 vessels.  *Id.*

10.    The Spliethoff Group in Holland formed Spliethoff Americas, Inc., a Texas corporation, on March 28, 2013, and opened its first U.S. office on May 3, 2013 in Houston.  *See* Ex. 3, Texas Secretary of State's Certificate of Incorporation of Spliethoff Americas, Inc.; *see* Ex. 4, Spliethoff's website, www.spliethoff.com/, visited Aug. 9, 2013.  Spliethoff's new Vice President – Business Development, who works in its Houston office, is Kyle Branting ("Branting"), who also worked for Intermarine prior to joining Spliethoff..

11.    Intermarine maintains a high level of confidentiality as to its clients, methods, pricing and other terms for providing its services so that it can remain competitive in this specialized and highly competitive worldwide market. Intermarine requires that all employees, including Bihlet and Branting,  agree in writing to maintain the confidentiality of the company's proprietary information.

12.    Intermarine's parent company concluded a transaction in August 2012 which included the purchase of Scan-Trans Holding A/S ("Scan-Trans"), a project cargo carrier based in Denmark.  At the time of the merger, Bihlet had worked for

Scan-Trans in Denmark and Houston for about ten years, eventually serving as President of the U.S.-based Scan-Trans, Inc.

13.     Within a few weeks of the merger,     Bihlet went to work for Intermarine in Houston as its Vice-President of Worldwide Chartering.     On September 27, 2012, Bihlet  signed the Agreement, which specifically superceded Bihlet's previous employment contract with Scan-Trans.  *See* Ex. 5 at 1.  Among other things, the Agreement contains restrictive covenants related to competition, solicitation of customers, and confidential information.

14.     The Agreement provides that either party may terminate the Agreement for any reason on ninety days' notice to the other party.   Ex. 5, ¶ 3.1.[1] In the event that either party gave the required 90-day notice, Bihlet's employment with Intermarine would terminate after expiration of the ninety-day period.

15.     The Agreement also requires that, during his employment with Intermarine, including any 90-day notice period, Bihlet  "not engage in any other business activity." Ex. 5, ¶ 1.3.

16.     Bihlet gave Intermarine the required 90-day notice on March 28, 2013, the same day that Spliethoff was incorporated in Texas.   Ex. 3.    After Bihlet provided this notice, Intermarine advised him that he was not required to come to the office on a regular basis during the 90-day period, provided that he was available to answer questions from other Intermarine employees during that period. Intermarine continued to pay Bihlet his full salary and provide medical benefits

---

[1] The 90-day notice requirement did not apply in the event of a termination for cause, which did not occur in this case.

during the entire 90-day period, as required by the Agreement.

17.    Bihlet's employment with Intermarine did not end until June 26, 2013, ninety days after he gave notice on March 28, 2013.    On April 17, 2013, Will Terrill, Intermarine's Vice President, U.S. Flag Services and General Counsel ("Terrill"), wrote to Bihlet, acknowledging that Bihlet had given notice of his resignation and that Intermarine would continue to pay Bihlet's base salary and provide his medical benefits under the Agreement, and would also compensate him for his unused annual vacation benefit.  *See* Ex. 6, April 17, 2013 letter from Terrill to Bihlet.    Terrill also reminded Bihlet of his ongoing obligations under ¶ 4 ("Unauthorized Disclosure; Non-Solicitation; Non-Competition; Proprietary Rights") of the Agreement:

> Both during and following the expiration of the notice period, the obligations set forth in Section 4 of the Agreement apply.  At this point in time, Intermarine *will not* waive any provision of the Agreement, except as otherwise provided herein. We are, however, willing to consider to a waiver or amendment of the obligations in the Agreement dependent on the circumstances.  If this is of interest, please let us know and we will consider the matter. (emphasis in original).

18.    On May 30, 2013, while Bihlet was still employed as an officer of Intermarine,  he wrote to Intermarine's CEO, Al Stanley, and to Terrill that he "will be taking up a new position with Spliethoff/Biglift" which he did not consider "a big threat" to Intermarine:

> Dear Will and Al
>
> In reference to your last letter send to me, please be informed that I will be taking up a new position with Spliethoff/Biglift. My 3 Months resignation period will end 30th of June. Since it was decided to send me home I have been available and continues to

be available to Intermarine until my 3 months resignation period is over for various calls from different employees looking for information of my previous dealings etc.

After the 3 month resignation period I do not consider it a big threat to Intermarine for me to go and work for Spliethoff as my market knowledge would be outdated and this would not be a direct competition to Intermarine due to different tradelanes and cargo compositions aimed at more Heavy lifts. Basically all dealing I have had would be either contracted or executed by this time.

I therefore kindly ask you to consider and releasing me from my contract in order for me to move on.

I can still be reached at 713 412 8044

Best Regards
Kasper Bihlet

*See* Ex. 7, e-mails between Will Terrill and Bihlet dated May 30, June 25 and 26, 2013.

19.     The Agreement imposes work restrictions on Bihlet for a period of six months following his June 26, 2013 termination, which is 90 days after he provided Intermarine notice of termination of the Agreement. These restrictions remain in place until December 26, 2013, six months after his termination.   Under ¶ 4.2 of the Agreement, Bihlet may not, until December 26, 2013, "directly or indirectly, own, manage, operate, join, control, be employed by, or participate in the ownership, management, operation or control of, or be connected in any manner with, including, without limitation, holding any position as stockholder, director, officer, consultant, independent contractor, employee, partner, or investor in, any Restricted Enterprise (as defined below)."    The Agreement (¶ 4.2) defines Restricted Enterprise as "any Person that is engaged, directly or indirectly, in (or

intends or proposes to engage in, or has been organized for the purpose of engaging in blue water shipping of heavy-lift cargo, irregularly shaped cargo, project cargo and break-bulk cargo anywhere in the world."

20.     Under ¶ 4.4(b) of the Agreement, Bihlet, may not, until December 26, 2013, "divert or take away, or attempt to take away any of the customers, clients, business or patrons of the Company or its affiliates (or potential customers or clients whose business the Employee solicited on behalf of the Company or its affiliates or about whose needs the Employee gained information during his employment with the Company."

21.     Para. 4.1 of the Agreement obligates Bihlet at any time during and after his employment with Intermarine not to disclose, communicate, or furnish to any other person, any information that he knows or should know to be confidential or proprietary information.  The Agreement specifically provides at ¶ 4.1 that this confidentiality covenant "has no temporal, geographical or territorial restriction."

22.     Terrill responded by e-mail to Bihlet on June 26, 2013 as follows:

Kasper

Thanks for the note.

We understand that your intent is to join Spliethoff/Biglift, who is an Intermarine competitor.  Under these circumstances, and at this time, Intermarine is *will not* waive any provision of the Agreement, including those provisions contained in Section 4. During the Restriction Period, the Company will pay your salary as provided for under your agreement with the Company.

We are willing to revisit the issue in approximately three (3) months, but cannot agree to a waiver of Section 4 or other provisions of you Agreement at this time.

If you have any questions or concerns, please feel free to contact us.

Will Terrill

Ex. 7 (emphasis in original).

23.     On Friday, July 26, 2013, Branting e-mailed Aernaut Meijer and Johan Arkema, two employees in Spliethoff's North American chartering department in Amsterdam. In the e-mail, Branting alerted them to a potential business opportunity for Spliethoff - the third of three shipments of a drilling rig to Nigeria by Caroil in October or November 2013.

24.     Branting copied this e-mail to what appear to be three Spliethoff offices or desks – "Africa", "Namerica Chartering" and "Spliethoff Houston". Branting also copied this e-mail to "Kasper Bihlet (Private)".  In his e-mail, Branting asked if there is interest in bidding on the Caroil job, states that "in October of 2012 and February of 2013 [he] moved 2 of 3 1200 HP rig" for Caroil. Branting also requested advice about pricing on a bid for this prospective job. *See* Ex. 8, e-mail thread between Kyle Branting, Kasper Bihlet, and others, July 26 – 29, 2013; *see* Ex. 11, Intermarine's booking notes for February 12, 2013 shipment on behalf of Global Shipping Consulting, which is Caroil's authorized agent.. Branting was employed by Intermarine in 2012 and in February 2013 when Intermarine shipped the two rigs to Nigeria for its client, Caroil.

25.     On Monday, July 29th , Branting e-mailed the same addressees on his July 26th e-mail about the potential Caroil shipment, again including "Kasper Bihlet (Private)", with the message:  "Trust below was received, pleased to hear if

interest?"   Ex. 8.  Bihlet responded to Branting's e-mail, with a copy to Thomas

Damsgaard, a Vice-President at Spliethoff:

> Kyle just quote it $119.75 w/m we can make money on that
> Best regards
> Kasper Bihlet

26.     Bihlet responded to Branting, that "we" - undoubtedly referring to

Spliethoff – could make money if Spliethoff bid the job as he suggested.  In a clearly

unintended move, Bihlet sent this e-mail to Branting at Branting's Intermarine e-

mail address.  Notwithstanding this slip by Bihlet, he has otherwise taken steps to

conceal his illegal activities on behalf of Spliethoff.  For example, Bihlet uses his

"private" gmail account (kbihlet@gmail.com) in his correspondence to and from

Spliethoff, not his public hotmail account.  *See, e.g.,* Ex. 8 at 1 ("**From:** Kasper

Bihlet [mail to: kbihlet@gmail.com"); *compare* Ex. 9 at 2, where Bihlet provides

kbihlet@hotmail.com as his contact address on his Linked In account.   But Bihlet

does not disclose on his Linked In account his work on behalf of Spliethoff; instead

he pretends to honor his non-compete agreement with Intermarine with the

following description of his current work experience:

> **Kasper Bihlet**
> gardening leave[2]
> marine transportation
> March 2013 – Present (6 months) / Houston, Texas area
> Breakbulk and Project Carrier

---

[2] The term gardening leave or garden leave "describes the practice whereby an employee
who is leaving a job (having resigned or otherwise had his or her employment terminated) is
instructed to stay away from work during the notice period, while still remaining on the payroll.
This practice is often used to prevent employees from taking with them up-to-date (and perhaps
sensitive) information when they leave their current employer, especially when they are leaving to
join a competitor." *See* Ex. 10,  https://en.wikipedia.org/wiki/Garden_leave, visited on Aug. 12, 2013
(footnote not in quoted matter).

*See* Ex. 9, Bihlet's Linked In profile, www.linkedin.com, visited August 12, 2013.

27.    Caroil has been an Intermarine client since 2011.  Bihlet and Branting are aware of this fact.

28.    During the course of Bihlet's employment, Intermarine entrusted him with confidential and proprietary business information and trade secrets which have independent value to Intermarine,  are not generally known or ascertainable by its competitors, and are critical to the company's ability to  maintain its competitive position in the industry.   Such information and trade secrets  include but are not limited to client names and lists, pricing, manufacturing, and engineering information, contracts and service agreements with vendors and clients, quality procedures, timing for movement of cargos, technical information about weights, dimensions and stowage of cargoes, other cargos moving in certain regions, and port information and operations.

29.    Intermarine would be at a substantial competitive disadvantage if the confidential and proprietary business information and trade secrets known by Bihlet  fell  into the hands of a competitor.

30.    Bihlet has violated the Agreement by (1) working for and/or on behalf of  Spliethoff in violation of his non-compete agreement with Intermarine,     (2) soliciting and intending to take away one or more Intermarine clients or assisting Spliethoff in soliciting one or more Intermarine clients, and (3) disclosing Intermarine's valuable confidential and proprietary business information and trade secrets.

31.    Bihlet has undertaken these activities with the intention of depriving Intermarine of its rights to its own confidential and proprietary business information and trade secrets and depriving Intermarine of its continued relationships with its clients.

32    Intermarine has invested considerable and significant resources in the development of its confidential and proprietary business information and trade secrets which are generally not known or readily ascertainable and, as such, could easily be exploited by Intermarine's competitors to allow them to gain a competitive advantage over Intermarine.

33.    Bihlet regularly accessed and utilized Intermarine's confidential and proprietary information and trade secrets in order to fulfill his job obligations as Intermarine's Vice-President.

34.    Bihlet knew that Intermarine specifically identified certain documents and data as confidential and proprietary business information, that such information had not been published or otherwise become a matter of public knowledge, and that he was at all times obligated to use it, if at all, exclusively for the benefit of Intermarine, but otherwise to keep it strictly confidential.

35.    Bihlet obtained, possesses and continues to possess without authorization Intermarine's confidential and proprietary business information and trade secrets, and has shared this confidential and proprietary business information with others, including Spliethoff.

36. Bihlet has used and is using Intermarine's confidential and proprietary business information and trade secrets to solicit on behalf of Spliethoff or to assist Spliethoff in soliciting Intermarine's clients.

37. Intermarine is in the process of preparing a bid for the same job for its client Caroil that Spliethoff is also preparing a bid. Spliethoff's bid is being prepared with the illegal assistance of Kasper Bihlet and the benefit of his knowledge of Intermarine's confidential and proprietary information and trade secrets. As a result of these ongoing events, time is of the essence. Issuance of a temporary restraining order ("TRO") and, in due course, a preliminary injunction is the only means by which Intermarine's confidential and proprietary information, trade secrets and customer goodwill can be protected from Bihlet's unlawful conduct.

## V. CLAIMS

### Claim 1 – Breach of Contract

38. Intermarine incorporates herein the allegations of paragraphs 7 through 37.

39. The Agreement is a valid and enforceable contract. Its provisions are reasonable, valid and tailored to reasonably protect Intermarine's confidential information, client contacts, client relationships, and goodwill, and do not unreasonably restrain Bihlet.

40. Intermarine is a proper party to sue for breach of the Agreement.

41. Intermarine has performed each obligation and condition required of it under the Agreement.

42.     Bihlet has failed to perform his obligations under the Agreement and has materially breached its terms and conditions.

43.     Intermarine has suffered damages as a direct result of Bihlet's breach, including damages to its business expectancies and goodwill, loss of clients, profits, market share, as well as attorneys' fees, expenses and court costs, and other damages in an amount to be determined at trial.

44.     Intermarine is also entitled under the Agreement to recover the salary it paid to Bihlet during the ninety-day notice period ($50,000) and the value of the medical benefits it provided Bihlet during this period.

45.     Plaintiff is entitled to an award of attorney's fees under Tex.Civ.Prac. & Rem. Code § 38.001(8).

### Claim 2 – Misappropriation of Trade Secrets

46.     Intermarine incorporates herein the allegations of paragraphs 7 through 37.

47.     Intermarine is the owner of certain confidential and proprietary business information which constitute trade secrets.

48.     On information and belief, Bihlet has used and/or disclosed trade secrets belonging to Intermarine.  Bihlet used and/or disclosed these trade secrets in violation of the Agreement and after acquiring them by improper means.

49.     By using and/or disclosing Intermarine's trade secrets, Bihlet has misappropriated and unlawfully used such information.

50.   Bihlet is liable to Intermarine in an amount to be determined at trial, including actual loss to Intermarine, unjust enrichment to defendant, a reasonable royalty, costs, and interest.

51.   Bihlet acted with malicious intent and/or reckless indifference to Intermarine's rights, thereby entitling plaintiff to an award of punitive damages and fees and costs.

### Claim 3 – Breach of Fiduciary Duty

52.   Intermarine incorporates herein the allegations of paragraphs 7 through 37.

53.   A fiduciary relationship existed between Bihlet and Intermarine based on Bihlet's appointment and service as an officer of Intermarine.

54.   On information and belief, Bihlet breached his fiduciary duties of loyalty and due care  to Intermarine by engaging in the conduct described above during his service as an officer of Intermarine.

55.   Bihlet's breach of his fiduciary duty proximately caused damage to Intermarine in an amount to be determined at trial.  Alternatively, Bihlet benefited from the breach of his fiduciary duty which entitles Intermarine  to an order that Bihlet disgorge all fees, compensation, or other benefits received from Spliethoff through the date of trial.

### Claim 4 – Tortious Interference with Prospective Relations

56.   Intermarine incorporates herein the allegations of paragraphs 7 through 37.

57.     As of the date that Bihlet's employment with Intermarine ended, the company had a continuing business relationship with various clients and a reasonable expectation that it would maintain these relationships from year to year.

58.     Bihlet had actual knowledge of each of these relationships.

59.     Bihlet intentionally interfered with at least one of these relationships without justification.

60.     As a proximate result of Bihlet's interference, Intermarine has suffered lost revenue, damage to its business relationships and goodwill, and other damages in an amount to be determined at trial.

61.     Bihlet acted with malicious intent and/or reckless indifference to plaintiff's rights, thereby entitling plaintiff to an award of punitive damages.

CONDITIONS PRECEDENT

62.     All conditions precedent have been performed or have occurred.

JURY DEMAND

63.     Intermarine demands trial by jury on all claims.

VI. <b>PRAYER FOR RELIEF</b>

WHEREFORE, Intermarine, LLC respectfully requests and prays that the Court enter judgment:

64.     placing a constructive trust on all amounts received by Kasper Bihlet through the unlawful conduct outlined above;

65.     permanently enjoining Kasper Bihlet from continuing to engage in such unlawful behavior;

66.    directing Kasper Bihlet to return to Intermarine, LLC any and all property in his actual or constructive possession which rightfully belongs to plaintiff;

67.    awarding compensatory and consequential damages against Kasper Bihlet in an amount to be proven at trial;

68.    awarding exemplary and punitive damages against Kasper Bihlet;

69.    awarding attorneys' fees, expenses, and costs of this action against Kasper Bihlet; and

70.    directing such other relief as the Court deems just and proper.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    _____

Maureen Blackburn Jennings
Attorney in Charge
Texas Bar No. 02385280
Fed. I.D. No. 9523
Andrew A. Woellner
Texas Bar No. 24060850
Fed. I.D. No. 876537
700 Louisiana Street • Suite 2600
Houston, Texas 77002
Telephone: (713) 626-1386
Telecopier: (713) 626-1388

**ATTORNEYS FOR PLAINTIFF
INTERMARINE, LLC**

## VERIFICATION

STATE OF TEXAS      )
                             ) ss.

COUNTY OF HARRIS   )

     AL STANLEY, being duly sworn on his oath, states that he is the President and Chief Executive Officer of Intermarine, LLC, that he has read the foregoing Verified Complaint for Injunctive Relief and Damages, and that the statements contained therein are true and correct to the best of his knowledge, information and belief.

Subscribed and sworn to before me this 13th day of August, 2013.

NOTARY PUBLIC

DIANA R. HENDRIX
Notary Public, State of Texas
My Commission Expires
May 05, 2015

My Commission Expires:

05·May-2015